BUSSIAN, et al., Plaintiffs,

v.

RJR NABISCO, INC., Defendant.

No. CIV.A. H–91–1533.

United States District Court,
S.D. Texas.

Sept. 2, 1998.

Randall W. Wilson, Houston, TX, for Plaintiffs.

Willis J. Goldsmith, Washington, DC, Gerald Bracht, Houston, TX, for Defendant.

LYNN N. HUGHES, District Judge.

Opinion on Summary Judgment

## 1. *Introduction.*

Beneficiaries of a retirement plan sued the plan's former sponsor for investing the plan's assets in annuities that later lost value when the issuer of the annuities was placed in a conservatorship. The loss of value evinces neither disloyalty, imprudence, nor a failure to diversify. There is no issue of fact on a breach of the sponsor's duties. The beneficiaries will recover nothing by this suit.

## 2. *Changes.*

In 1984, RJR Nabisco, Inc., sold its subsidiary oil company, Aminoil, to Phillips Petroleum. After the sale, Phillips assumed the obligations for the Aminoil employees who were still working, but Nabisco continued to administer the Aminoil retirement plan for people who had stopped working by the date of the sale. While some of the beneficiaries were receiving benefits, others were eventually due vested benefits; these vested employees had been with Aminoil long enough to earn retirement benefits, but they were not yet old enough to receive payments.

The retirement plan was covered by federal law. *See* Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1003(a)(1). It had "defined benefits," meaning that specific dollar amounts were fixed in the plan; increases in the value of the plan's assets did not increase the retirees' benefits. The plan itself expressly allowed Nabisco to terminate it, to buy an annuity to furnish benefits, and to recover residual assets. Its text mirrored the requirements of federal law about terminating plans.

In the fall of 1986, Nabisco's board of directors voted to terminate the Aminoil plan along with several others. The sponsor's contributions to the Aminoil plan had funded it far beyond the expected value of the benefits. Nabisco ultimately paid Executive Life Insurance Company $54 million for an annuity to fund several plans, including Aminoil's, on August 17, 1987, and $43 million reverted to Nabisco on April 27, 1989.

By buying an annuity, Nabisco would fix its cost for the benefits at the price of the annuity, freeing the excess for Nabisco. Also, hiring an outside administrator would reduce Nabisco's management costs for keeping records, sending notices, and disbursing benefits. These costs were about $10 per month per participant, totaling about $180,000 per year.

## 3. *Selecting an Issuer.*

After deciding to terminate the plan, Nabisco's management began looking for a company to issue the annuity. It first consulted corporate counsel and then hired an outside firm—Buck Consultants—to assist it in selecting an issuer. Buck had experience purchasing annuities for plan terminations and had established itself in the rather narrow field of capably soliciting and evaluating bids. Nabisco required the insurer to meet three specific criteria:

• Have a credit rating of at least AAA from Standard & Poor's; • Have administrative capability for over 10,000 participants; and • Have Buck's approval.

In early 1987, Buck began seeking bids from insurers. In compiling a list of insurers for solicitation, Buck investigated the companies' abilities and reputations. A Nabisco officer suggested that Buck solicit a bid from Executive in the hope that it would bid low, generating low bids from the other companies; Nabisco did not think that Buck would seriously consider Executive as the annuity provider. Buck then formally solicited bids and later furnished the insurers with additional data to enable them to adjust their bids. Five insurers bid; four of them submitted final bids that met Nabisco's criteria:

| Insurer | Preliminary Bid | Final Bid |
|---|---|---|
| AIG | $63.6 million | $60.2 million |
| Aetna | $62.7 million | $61.9 million |
| Prudential | $62.2 million | $56.7 million |
| Executive Life | $59.4 million | $54 million |
| Mutual Life | $52.3 million | [none] |

Each of the four had capacity to administer the annuity, competence in the annuity business, and high ratings from independent agencies. Buck **reviewed reports from A.M. Best, Conning & Company, Standard & Poor's, and Moody's; all four of the companies making final bids had comparable ratings:**

| Insurer | S&P | Best | Moody's |
|---|---|---|---|
| Aetna | AAA | A+ | AAA |
| AIG | AAA | A | AAA- |
| Executive Life | AAA | A+ | A3 |
| Prudential | AAA | A+ | AAA |

**Conning rates liquidity rather than investment or credit risk generally;** it gave Executive a higher solvency rating than it gave Prudential. **Buck ultimately recommended all four final bidders to Nabisco, including Executive.**

Having concluded that all four were acceptable, Buck focused on the low bidders—Prudential and Executive—to negotiate an even lower bid. Throughout the bidding, Executive had responded to Nabisco's questions and inquired about the process; this led William Overgard, an investment consultant at Buck, to conclude that Executive had the best understanding of Nabisco's requirements for the project.

### 4. *Executive.*

In the American insurance business, Executive was an aggressive newcomer. Like old, prestigious insurance companies in the 'eighties, it had real or apparent scandals. Executive entered the annuity market in the mid–1980s and established a reputation for strong administration. In the general restructuring of corporate finances, it developed particular strengths in contracting for pension plan investments and administration and offering high-interest, fixed-income investments.

Buck examined Executive's investment ratings closely because its portfolio had more than fifty percent high-interest bonds, commonly known then as "junk" bonds as opposed to "gilt-edged" bonds. Buck found that Executive had received high marks from investment rating agencies in recent years. It had the highest possible rating from Standard & Poor's and Best, and Conning had given it a higher solvency rating than it gave Prudential. **These ratings reflected an apparent ability to fulfill its obligations.** Buck also learned that its high-yield portfolio was broadly diversified. Buck regarded its investment strategy as sound.

In August 1987, Nabisco selected Executive to furnish the annuity for $54 million. Nabisco said it chose Executive based on its credit ratings, administrative capabilities, and bid of $2.7 million—about five percent—lower than the next lowest, and on Buck's recommendation. The Pension Benefit Guaranty Corporation's audit of Nabisco's actions found that they complied with federal requirements. Nabisco could have bought the annuity even if it had continued as administrator.

### 5. *The Best Laid Plans ...*

In April 1991, four years after Executive contracted to administer the Aminoil plan, the commissioner of the California Insurance Department placed Executive in a conservatorship. A slump in the prices for high-yield bonds had made it appear insolvent.

Lump-sum disbursements were suspended, and installments disbursements were re-

duced to about 70% of the contract amount. Beneficiaries could either participate in the commissioner's rehabilitation program for the company or opt out of it, receiving (a) a cash payment worth about fifty-five percent of the frozen pension's net present value and (b) a right to future payments from recovery trusts. Eventual payments would satisfy between seventy-five and eighty-five percent of the contract amount.

Beneficiaries eligible for current annuity payments fall into two classes: Those who live in a state with a pension guaranty fund and those who reside in the other two states—Colorado and Louisiana. Since 1991, beneficiaries in the first group have received everything under their contracts, except for some back interest. Beneficiaries in Colorado and Louisiana have received on average about fifty-seven percent of their contract amounts.

### 6. *The Plaintiffs.*

Robert A. Bussian, Aminoil's former general counsel, and James J. Keating, Aminoil's former chief financial officer, brought this suit as the representatives of a putative class of fifteen-hundred plan members against Nabisco. They plead numerous causes of action, including breach of fiduciary duty, negligence, gross negligence, recklessness, and acting "with disregard for the safety of the members of the Aminoil Retirement Plan." They want a declaration that Nabisco is responsible for the plan's losses.

The plaintiffs seek class certification. The court has deferred ruling on certification pending resolution of the motion for summary judgment. Because neither of the named plaintiffs will recover anything by this suit, the court will not certify the class.

### 7. *Plans & Their Parts.*

Under American law about benefit plans for employees, the plan itself has an independent juridical existence. The plan has relations to three principal other entities:

- The sponsor, which is the employer;
- The administrator, which may be the sponsoring company itself or a third-party company furnishing the services by contract; and

- The beneficiaries, who are the employees and those whose claims derive from the employee, like dependents and relations.

The sponsor makes contributions to the plan based on the plan's terms. The two main types of plans require either a defined contribution by the sponsor or a contribution to furnish a defined benefit. In the first type, the beneficiary participates in the success of the investments; in the second, the beneficiary gets his specified disbursement. In both cases the beneficiary has some "credit" risk: companies sometimes fail before fully funding their plan obligations and sometimes do not pay the benefits as contractually obliged. The persistence of risk in even this highly regulated field explains why forty-eight states have public bodies that insure plan payments.

### 8. *The Standards.*

The federal statute governing retirement benefits imposes on the administrator of a plan the fiduciary duties of prudence, loyalty, and diversification. 29 U.S.C. § 1104(a) (1990).

When a company meets its obligations to the plan by buying an annuity, it transfers to the issuer of the annuity the obligations to meet the payments. If the company makes a reasonably prudent decision in choosing an insurer, it has no further responsibility to the plan. The transfer must be predicated on data that a reasonably prudent person in that business would be expected to learn before deciding. 29 U.S.C. § 1104(a)(1)(B) (1990) (requiring fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims").

Prudence requires a fiduciary diligently to investigate the transaction with appropriate methods and to make a reasonable decision based on the investigation. *Riley v. Murdock,* 890 F.Supp. 444, 458–59 (E.D.N.C. 1995), *aff'd without published opinion,* 83 F.3d 415 (4th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 387, 136 L.Ed.2d 304 (1996).

Because a significant portion of investment decisions are going to result in losses, the administrator's decision cannot rationally be evaluated by the actual outcome. Rather it is reviewed (a) by what could have reasonably been known at the time it was made and (b) by what techniques of analysis were used. An elaborate process does not mean that there will be no losses, but it does tend to eliminate casual and corrupt choices by showing the reasonable alternatives that should have been considered. *See Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir.1983) (noting that focus of prudence inquiry is not ultimate success or failure of investment); *DeBruyne v. Equitable Life Assurance Soc'y*, 720 F.Supp. 1342, 1349 (N.D.Ill.1989), *aff'd*, 920 F.2d 457 (7th Cir. 1990) ("The fiduciary duty of care requires prudence, not prescience.").

■■■ The duty of loyalty requires the administrator to act in the best interests of the participants. No decision by an administrator, however, will be completely conflict free; nearly every decision affects the cost that the administrator bears or the potential at least for a residuum for the sponsor. Although the statute lists loyalty separately from prudence, they certainly overlap; satisfying the prudence requirement may fulfill the duty of loyalty. *See Riley*, 890 F.Supp. at 459 ("[T]he legislative history of the statute suggests that Congress intended a fiduciary to be able to meet the 'exclusive purpose' requirement by satisfying the prudence requirement. Additionally, courts have held that a fiduciaries' decision based on the advice of retained experts did not violate the duty of loyalty.") (citation omitted). While the ethics of commerce receive a lot of criticism, the customary practices of those who are entrusted with the property of others for compensation are both commercially reasonable and publicly responsible. Economics, more effectively than law, compels adherence to both standards.

9. *The Objections.*

A. *Investigation.*

■■■ The plaintiffs attack Nabisco's investigation of Executive. A prudent sponsor-administrator would examine a prospective administrator's investment policy. Executive was examined more thoroughly than the other companies Nabisco considered for the annuity. An expert closely assisted Nabisco in the investigation. *See Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir.1983) (noting that while experts must be used properly and that using one is not a "magic wand," "ERISA fiduciaries need not become experts . . .—they are entitled to rely on the expertise of others."), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *Riley*, 890 F.Supp. at 458 (noting that expert assistance is part of examination of appropriateness of investigation). Buck closely inquired about Executive through the New York Insurance Commission. It examined the major rating agencies' ratings. It contacted Moody's to ascertain its basis for rating Executive slightly lower than other agencies did. Overgard discussed those subjects directly with Executive representatives, and he sought industry "intelligence" on Executive from insurers and investment bankers.

After seven months of work, Buck concluded that Executive was a sensible candidate for the annuity. In its investment strategy, Executive was not reasonably discernable as imprudent. Nabisco had no knowledge that the particular portfolio of investments held by Executive would be too risky—too volatile, more precisely. Although some people in Nabisco management admit that they knew about Executive's bad publicity, giving full credit to the beneficiaries' conspiratorial view requires Nabisco to have known that Executive was suicidal in its investment strategy.

The plaintiffs' efforts to avoid that fact are unavailing. They complain that a court that has approved another investigation of Executive expressly noted that the plaintiffs there did not offer evidence to show that the fiduciary "should have known of any problems at Executive Life in 1986" and rejected an expert's conclusory assertions to the contrary. *See Riley*, 890 F.Supp. at 458, 459–60 (dismissing claims against fiduciary who selected Executive in terminating plan after investigation similar to Nabisco's). The distinction is unavailing. Simply knowing of problems does not demonstrate imprudence; to the

contrary, making an informed decision based on available information—warts and all—is the essence of prudence. That the company selected has problems is not surprising, but by itself does not demonstrate imprudence. The plaintiffs could show imprudence only if Nabisco knew of the problems and what eventually would happen and then, without additional investigation or consideration, blindly charged ahead. There is simply no causal connection between Executive's bad press and what eventually happened.

■ The department of labor has implicitly, though inadvertently, recognized the prudence of selecting Executive in 1987. In 1995 it purported to fulfill "a need for further guidance regarding the selection of [pension benefit distribution] annuity providers by plan fiduciaries" by issuing guidelines in an interpretative bulletin in direct response to the Executive situation. *See* 60 Fed.Reg. 12,328, 12,330 (1995) (codified at 29 C.F.R. § 2509.95–1). It requires fiduciaries to "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities" and to evaluate "a potential annuity provider's claims-paying ability and creditworthiness" because of the beneficiaries' "paramount interest in the ability of the provider to make those payments." It also notes that a "fiduciary may conclude, after conducting an appropriate search, that more than one annuity provider is able to offer the safest possible annuity."

The bulletin specifically criticizes those who selected Executive years before the bulletin was issued. It has an effective date of January 1, 1975, though it was not issued until March 6, 1995. The department and the plaintiffs blame people for failing to comply with standards that did not arise until years after the acts in question. It is one thing to scrutinize conduct with the benefit of hindsight; it is altogether another to impose retroactively standards that arose in direct response to that very conduct. That the department found it necessary to clarify the standards demonstrates the absurdity of blaming Nabisco for selecting Executive.

■ The plaintiffs also infer something sinister from Nabisco's decision not to use Executive for the plans it retained. That is not evidence that Nabisco knew that Executive was unsound. Nabisco's strategy for active plans of its subsidiaries could rationally be different from the dormant plans of former subsidiaries. Using different administrators for different plans does not suggest imprudence or disloyalty.

Nabisco's investigation of Executive was not imprudent.

### B. *Ratings.*

■ The plaintiffs then argue that the results of the investigation and other available information militated against Executive. As evidence of Nabisco's imprudence, they point out that Executive did not receive the highest possible ratings from *every* agency.

They say, as the California Insurance Commissioner apparently believed, that the rating agencies themselves were incompetent in evaluating investment risk at insurance companies. To get anywhere with that theory, they would have to show that the agencies were incompetent, which they cannot, and that Nabisco should have reasonably known of their incompetence.

They complain that A.M. Best was inadequate. Admittedly, the only evidence that Best does a reasonably thorough job of evaluating insurance companies is that it gets paid for its product by thousands of people directly interested in the accuracy of its ratings. The plaintiffs point out that Best failed to predict the bankruptcies of some companies. It is not in the prediction business; it reports data and estimates. Its current rating reports provide four pages of detailed analysis in fine print.

They complain that Moody's and Standard & Poor were inexperienced at rating life insurance companies' obligations. Perhaps that lack of experience explains why Moody's rated Executive lower than the other three final bidders. To the extent Moody's was inexperienced, Buck specifically contacted Moody's to ascertain its basis for rating Executive slightly lower than other agencies did.

They note that in 1987 Duff & Phelps placed Executive in its ninth rating category. They fail to demonstrate that Duff & Phelps has a better record overall than the other agencies.

They criticize Nabisco's choice of Executive over companies that received similar or higher ratings from other investment agencies. They insist gratuitously that Nabisco should not have relied on ratings not updated more frequently than annually. Semi-annual revisions of ratings in 1987 would not have revealed a drop in the market for high-yield bonds generally—let alone the shallow, trendy, and politically motivated regulatory response of the California Insurance Commissioner.

The end of this series of complaints is the conclusion that Nabisco could not reasonably rely on anything from anybody. In real life, serious decisions have to be made on incomplete information about an uncertain future in an imperfect world. Ratings are a perfectly useful and reasonable tool to use in conducting an investigation. *See Riley,* 890 F.Supp. at 458 (approving reliance by company that selected Executive on same rating agencies Nabisco used); 60 Fed.Reg. 12,328, 12,330 (1995) (codified at 29 C.F.R. § 2509.95–1) (noting, nearly a decade after the relevant events, that "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an appropriate annuity provider."). Though in hindsight the decision was unfortunate, it was not imprudent. Nabisco's use of the consultant and rating agencies does not demonstrate imprudence.

## C. *Conflict.*

■ The participants assert that Nabisco had a conflict of interest because it owed distinct fiduciary duties to them and to its shareholders. They say that Nabisco violated its duty of loyalty by resolving that conflict to their detriment in taking the lowest bid rather than the next lowest bid, increasing the reversion to Nabisco.

■ Federal law expressly does not prohibit a fiduciary from "serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest." 29 U.S.C. § 1108(c)(3). There is thus no inherent conflict in Nabisco's having a duty both to its shareholders and to the plan's beneficiaries. *See Local Union 2134, United Mine Workers of America v. Powhatan Fuel, Inc.,* 828 F.2d 710, 713 (11th Cir. 1987).

Nor does Nabisco's right to a reversion from the plan's excess assets create an insurmountable conflict. The plan documents and the law allow the sponsor to buy an annuity to replace the sponsor's obligations under the plan and to obtain a reversion from the plan's excess assets. The plaintiffs can succeed on this claim only if they can show that Nabisco, to obtain an advantage for itself, acted to their detriment by buying a cheaper annuity that was patently less safe. Even the department of labor's tardy but supposedly retroactive admonitions recognize that Nabisco could avoid a conflict of interest:

> [A] fiduciary's decision to purchase more risky, lower-priced annuities in order to ensure or maximize a reversion of excess assets that will be paid solely to the employer-sponsor in connection with the termination of an over-funded pension plan would violate the fiduciary's duties under ERISA to act solely in the interest of the plan participants and beneficiaries. In such circumstances, the interests of those participants and beneficiaries who will receive annuities lies in receiving the safest annuity available and other participants and beneficiaries have no countervailing interests. The fiduciary in such circumstances must make diligent efforts to assure that the safest available annuity is purchased.... Special care should be taken in reversion situations where fiduciaries selecting the annuity provider have an interest in the sponsoring employer which might affect their judgment and therefore create the potential for a violation of ERISA § 406(b)(1). As a practical matter, many fiduciaries have this conflict of interest and therefore will need to obtain and follow independent expert advice calculated to identify those insurers with the high-

est claims-paying ability willing to write the business.

29 C.F.R. § 2509.95–1 (1997). Nabisco did obtain and follow independent expert advice, and, the court, like other courts, rejects the safest-available-annuity standard, as discussed below.

To the extent that a conflict existed, the beneficiaries were not harmed by it. The purported conflict here is obviously over the excess plan assets: the participants wanted to use them to obtain the best issuer for their retirement benefits, while Nabisco wanted them left out of the assets in the plan so as to maximize its reversion. The plaintiffs' argument goes even further; they insist that Nabisco had a "duty" to use all "available" funds for the beneficiaries.

The beneficiaries, however, plainly had no right by contract or law to the excess assets themselves. Nabisco had no duty to the beneficiaries about the excess funds anymore than it had a duty to them about how it spent any other $8 million out of the shareholders' equity of $6 billion. The change in administrators did not change the amount of the benefits nor the obligation between the beneficiaries and the plan. Selecting the low bid unquestionably benefitted Nabisco: its reversion increased by either $2.7 million, $6.2, or $7.9 million. Selecting the low bid did not help the beneficiaries, but one party's benefit is not necessarily another's detriment. The beneficiaries would not have *received* that money if Nabisco had chosen a different insurer; they only would have gotten a more expensive annuity. Apparently they believe that more expensive is tantamount to better or safer.

Nabisco did not disloyally act on a conflict of interest. *See Riley,* 890 F.Supp. at 459 (holding that fiduciary acted for exclusive purpose of plan beneficiaries in prudently selecting Executive for annuity).

D.  *Low Bid.*

█    Nor did Nabisco have to spend excess funds on a more expensive plan if it prudently selected the plan. The beneficiaries insist that Nabisco's taking a low bid was improper. Extended to its illogical conclusion, their claim is that prudence required Nabisco to select the highest bidder. They contend that the lowest bid for an annuity means the highest risk for the participants, inferring that the lowest bidder must be unqualified.

Nabisco did not violate its fiduciary duties to the annuity beneficiaries by selecting the lowest bidder. Sound specifications and bidding are commonly required by statute in public contracts for both honesty and efficiency. Before one of his early flights, someone asked astronaut Gus Grissom if he were nervous, and he replied, "Yes. I am sitting on top of 150,000 parts made by the lowest bidder." The proper question looks at the qualifications of the bidders and the specifications for the service: picking the lowest *qualified* bidder is perfectly prudent. No defect has been discovered in the initial requirements for bidders. The plaintiffs apparently would have been happy with any of the other four finalists, but this preference is based wholly on the 1991 disaster not on the 1987 criteria for bidders.

Selection of the lowest bid does not imply that the bid is the riskiest or that the company is the least competent. The point of soliciting bids is that you force the potential suppliers to price their product as low as is reasonable—at their marginal cost. The specifications dictate the product's features. Even if the plaintiffs' theories about accepting low bids were true, there was less than a thirteen percent spread in bids; the five percent spread between the bottom two bids is even less remarkable. No one could have divined from these modest divergences a material difference in risk that the company would become insolvent four years later.

The department of labor requires the selection of "the safest annuity available." This court, like other courts, rejects such a stringent standard. *See Riley v. Murdock,* 83 F.3d 415 (4th Cir.1996) (refusing to adopt such a strict standard—and noting that no other federal court had adopted it—in affirming summary judgment for fiduciary who had purchased a group annuity contract from Executive Life) (per curiam) (unpublished). Even the bulletin recognizes that in some situations it might be appropriate "to pur-

## 689

chase other than the safest possible annuity," such as when "the safest available annuity is only marginally safer, but disproportionately more expensive than competing annuities, and the participants and beneficiaries are likely to bear a significant portion of that increased cost" or when "the safest available annuity is unable to demonstrate the ability to administer the payment of benefits." The department makes more sense when it notes that low cost does not justify an unsafe annuity; implicit in that statement is that a low qualified bid is perfectly acceptable.

Nabisco protected against unqualified bidders. Accepting low bids from qualified insurers demonstrates prudence. Nabisco violated no duty by accepting a low bid.

### E. *Diversification.*

The plaintiffs complain that Nabisco failed to diversify their plan's investments.

To the extent that the plaintiffs complain of Nabisco's not using more than one insurance company to supply the plan's benefit payments, a sponsoring company may invest all of a plan's assets through one company. Nabisco had a contract with one company to furnish the investment service of diversification, as well as the other variables in investment finance. It did not buy one bond; it contracted for one company to manage a portfolio of investments. Most plans are invested through a single company, as most individuals buy insurance from one company.

The real complaint is that Nabisco selected an annuity provider that did not diversify its investments supporting the contractual obligations to the plan. Because Executive held up to fifty-seven percent of its assets in high-yield bonds and invested more than fifty percent of the Aminoil plan's assets in high-yield bonds, the participants say that it was violating prudent investing's principle of diversification.

Federal law requires a fiduciary to "diversify[ ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly not prudent to do so." 29 U.S.C. § 1104(a)(1)(C). Although diversification has been described as spreading your ignorance around, it is still

the fundamental technique for reducing company-specific risk. Well-diversified investment strategy spreads risk; a reasonable investor seeks a balance within the limits of excessive concentration and diffusion. Insurance is the business of spreading risk. Executive was in that business, and Nabisco paid it to manage the investments. Excess diversification carries its own risks, as the counterpoint folk sayings illustrate—"all eggs in one basket" is opposed by "too many irons in the fire."

No fact suggests that Nabisco or Executive imprudently failed to diversify the plan's investments. While investing in *one* junk bond would be a failure to diversify, investing in many junk bonds *is* diversification.

Although Executive's portfolio was one-half high-interest bonds, the bond portfolio itself was broadly diversified, reducing the risk that a default in a single bond would materially affect the company. Executive had an "aggressive" strategy of investing in high-yield bonds but a long-term investment program. It would have recovered from the market losses that prompted the California Insurance Commissioner to seize the company within one year of the seizure. The bonds held by Executive were not in default; the specific borrowers had not failed to pay. When fears of default in the market generally had caused lenders to reduce the prices they were willing to pay other lenders to acquire this type of bond, California intruded itself; the drop in the market as a whole lowered the value of Executive's portfolio to a level that was less than its obligations. Unlike the conservator, not every bondholder dumped its portfolio in an overreaction to a market decline. If the conservator had followed Executive's initial strategy, everyone would have been paid in full years ago. The nice man from the government of California—not a lack of diversity—converted a temporary problem into a permanent disaster.

### 10. *Junk, Risk, & Reality.*

"Junk" bonds have a relatively high rate of interest. The higher interest is not free; it is compensation for a higher risk of default.

The data indicate that the risk premium charged by lenders during the 1980s more than compensated for the defaults in the aggregate. Aggregate numbers only show that the market was working; they yield no practical solace to those who owned the bonds that did default. This means that the lenders—bankers and plan participants— were prudent in setting the interest rates on junk bonds because they made an "excess" profit—not the borrowing wheeler-dealers. *See* Glenn Yago, JUNK BONDS: HOW HIGH YIELD SECURITIES RESTRUCTURED CORPORATE AMERICA 33 (1991) (concluding that "the returns of junk bonds have more than compensated for incremental lending risk"); Marshall E. Blume, et al., *Returns and Volatility of Low Grade Bonds 1977–1989*, 56 J. FINANCE 1, 73 (March 1991) (finding "no evidence that low-grade bonds are significantly over- or underpriced"); *see generally* Edward I. Altman et al., *Defaults & Returns on High Yield Bonds: Analysis Through 1996*, NEW YORK UNIVERSITY SALOMON CENTER (January 1997).

The plan naturally had some risk; if the beneficiaries wanted a no-risk plan, they could have bought a bonded plan where the administrator had a performance bond on the annuity issuer. That would have cost more, and, consequently, their potential cash compensation lower. There is some risk that both the issuer and the bonding company would fail, requiring a really risk averse beneficiary to buy a bond to cover the bond. These two sophisticated legal and financial executives did nothing to insure their plan participation despite their inquiries and concerns over Executive at the time of its selection.

In their attack on Nabisco, the participants have pointed to every blemish on Executive and others associated with it. The plaintiffs have bloated the record with every negative reference they could locate in the financial press back in 1987 as well as later reports. The theme that runs through them is guilt by association with the likes of Ivan Boesky and Michael Milken, who were charged with trading in the public securities markets with nonpublic information. If those people did use inside information to buy bonds at a disadvantage to the general public, Executive as their customer was among the beneficiaries not victims.

To be fair, that same financial press has not been favorable to the real cause of this debacle, the California Insurance Commissioner. *See* Ellie Winninghoff, *Smart buyer, dumb seller*, FORBES March 14, 1994, at 71 (criticizing California Insurance Commissioner's seizure of Executive and noting that he "graduated Harvard Business School but must have slept through his finance classes"). In addition to the panic selling of the bonds by the California conservator, the New York commission on insurance has been criticized by other government agencies for its role in this mess. The conservator also sued the rating agencies and nearly everyone else.

Nabisco was required to make an informed investment decision, not to predict the future; the law requires only prudence, not prescience. *DeBruyne*, 720 F.Supp. at 1349. If Nabisco had known of the changes in the tax code, interest rate fluctuations, demand shifts, oil price changes, and the rest of the things that affected the financial soundness of the American economy as well as the consequent effect on the bond market, it might have done a lot of things differently besides buying a different annuity.

11. *Conclusion.*

The plaintiffs' argument runs: If a lot of money was lost, somebody must be at fault. If Nabisco made a decision that lost money for the beneficiaries, Nabisco is incompetent. If Nabisco used a consultant, the consultant was incompetent because the result was a loss. If the consultant relied on rating agencies, they were incompetent. If there were an agency that rated rating agencies, it would be incompetent, too, as long as the plaintiffs lost money. The only material deficiency they identify is the result—the loss. They essentially want strict liability: if they lost money, Nabisco pays. Using the talisman of fiduciary duty, the plaintiffs seek to convert the duties of prudence, loyalty, and diversification into a guaranty of absolute payment.

Nabisco owed the beneficiaries several duties, but the plaintiffs do not seek prudence or loyalty—they seek certainty. A fiduciary duty imposes rigorous responsibilities, but its strictures are neither absolute nor endless. Fiduciaries are not insurers. Nabisco made this decision in 1987. The company that it selected to issue the annuity suffered market losses in its portfolio in 1991. The loss in value of the investment by 1991 does not allow the inference of an imprudent decision in 1987.

Nabisco's investigation of the information available in 1987 indicated that Executive was a sound choice. It made a reasonable decision based on the information then before it and did not breach its duties to its retirement policy holders, even though the investment later declined in value. Nabisco lived up to the standards that the law requires. The plaintiffs will take nothing.